1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11                    PORTLAND DIVISION

12  TRAVIS BLUE,                    )
                                    )
13                  Plaintiff,      )
                                    )    No.  CV-09-1213-HU
14       v.                         )
                                    )
15  BRONSON and MIGLIACCIO (nka     )
    BRONSON, CAWLEY & BERGMANN),    )    OPINION & ORDER
16                                  )
                    Defendant.      )
17  _____)

18  E. Clarke Balcom
    Jay B. Derum
19  CLARKE BALCOM, P.C.
    1312 S.W Sixteenth Avenue, 2nd Floor
20  Portland, Oregon 97201

21       Attorneys for Plaintiff

22  David S. Aman
    TONKON TORP LLP
23  1600 Pioneer Tower
    888 S.W. Fifth Avenue
24  Portland, Oregon 97204

25       Attorney for Defendant

26  HUBEL, Magistrate Judge:

27       Plaintiff Travis Blue brings this debt collection practices

28  action  against  defendant  Bronson  and  Migliaccio,  now  known  as

1 - OPINION & ORDER

1  Bronson, Cawley & Bergmann.  Defendant moves for partial summary

2  judgment.  All parties have consented to entry of final judgment by

3  a Magistrate Judge in accordance with Federal Rule of Civil

4  Procedure 73 and 28 U.S.C. § 636(c).  I grant the motion in part

5  and deny it in part.

6                              BACKGROUND

7      Defendant, a law firm located in New York, is a debt

8  collector.  In the spring of 2008, defendant began trying to

9  collect a debt owed by plaintiff.  From the spring of 2008 through

10  November 2008, defendant had at least twenty-three phone calls with

11  plaintiff and made two phone calls to plaintiff's father in an

12  effort to collect the debt.

13      Defendant's employees allegedly made threatening statements to

14  plaintiff during the calls, including threats to garnish his wages

15  and file lawsuits.  They repeatedly asked plaintiff to get money

16  from his family and friends to pay the debt.  They also made

17  statements that plaintiff considered condescending and abusive,

18  such as calling him "irresponsible."

19      In August 2008, plaintiff authorized defendant to make monthly

20  withdrawals of $200 from his bank account.  Defendant told

21  plaintiff that the withdrawals could be stopped at his request.  On

22  September 29, 2008, plaintiff contacted defendant and told one of

23  its employees not to withdraw the $200 that month, which was

24  scheduled for September 30, 2008.  During this call, he told

25  defendant's employees that he could not make the payment because if

26  he did, he would not have money to pay for food and rent.

27      However, despite the call, defendant withdrew the $200.  As a

28  result of defendant's withdrawal, plaintiff was unable to pay other

2 - OPINION & ORDER

1  bills and incurred bank charges.  When plaintiff discovered that

2  defendant had withdrawn the money, he contacted defendant.  An

3  employee told plaintiff they had no record of his call and told him

4  he could not get his money back.  Plaintiff had a subsequent call

5  with a supervisor who made remarks that plaintiff considered

6  condescending and also threatened to turn the account over to an

7  attorney.

8       In addition to calls to plaintiff, defendant called

9  plaintiff's father in August 2008.  Plaintiff and his father were

10 very close.  At the time of these calls, plaintiff's father was

11 very ill with chronic obstructive pulmonary disease.  Plaintiff

12 told defendant his father was ill and requested that defendant not

13 call plaintiff's father any more because the calls were upsetting

14 plaintiff's father.  It is alleged the calls were so upsetting that

15 they caused him breathing problems.  Disregarding this request,

16 defendant called plaintiff's father again in September 2008.

17      Plaintiff was concerned that the continuing calls to his

18 terminally ill father could hasten his father's death.  Plaintiff

19 confronted an employee of defendant's named "Robert," about the

20 calls to his father.  Robert told plaintiff that defendant had

21 never made any calls to plaintiff's father.  This was extremely

22 upsetting to plaintiff because he knew that calls had been made and

23 he feared defendant would continue to call and harass his father.

24      After October 14, 2008, calls to plaintiff by defendant

25 occurred on only two dates:  October 15, 2008, and November 18,

26 2008.

27      As a result of the dealings with defendant, plaintiff suffered

28 a series of anxiety attacks, embarrassment, and shame.  At the

3 - OPINION & ORDER

1   time, however, plaintiff was already having anxiety attacks as a

2   result of the financial pressure he was under, regardless of

3   anything defendant may have done.

4                                STANDARDS

5        Summary judgment is appropriate if there is no genuine issue

6   of material fact and the moving party is entitled to judgment as a

7   matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the

8   initial responsibility of informing the court of the basis of its

9   motion, and identifying those portions of "'pleadings, depositions,

10  answers to interrogatories, and admissions on file, together with

11  the affidavits, if any,' which it believes demonstrate the absence

12  of a genuine issue of material fact."  Celotex Corp. v. Catrett,

13  477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

14       "If the moving party meets its initial burden of showing 'the

15  absence of a material and triable issue of fact,' 'the burden then

16  moves to the opposing party, who must present significant probative

17  evidence tending to support its claim or defense.'"  Intel Corp. v.

18  Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)

19  (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th

20  Cir. 1987)).  The nonmoving party must go beyond the pleadings and

21  designate facts showing an issue for trial.  Celotex, 477 U.S. at

22  322-23.

23       The substantive law governing a claim determines whether a

24  fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors

25  Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as

26  to the existence of a genuine issue of fact must be resolved

27  against the moving party.  Matsushita Elec. Indus. Co. v. Zenith

28  Radio,  475 U.S. 574, 587 (1986).  The court should view inferences

4 - OPINION & ORDER

1    drawn from the facts in the light most favorable to the nonmoving

2    party.  T.W. Elec. Serv., 809 F.2d at 630-31.

3         If the factual context makes the nonmoving party's claim as to

4    the existence of a material issue of fact implausible, that party

5    must come forward with more persuasive evidence to support his

6    claim than would otherwise be necessary.  Id.; In re Agricultural

7    Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

8    California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

9    Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

10                               DISCUSSION

11        In his Second Amended Complaint, plaintiff brings the

12   following claims:  (1)  a federal Fair Debt Collection Practices

13   Act (FDCPA) claim; (2) a claim under Oregon's Unfair Debt

14   Collection Practices Act (OUDCPA), and (3) a claim for intentional

15   infliction of emotional distress (IIED).

16        In this motion, defendant moves for summary judgment as

17   follows:  (1) on the two debt collection claims for any violations

18   occurring prior to October 14, 2008, and limiting the claim to the

19   phone calls alleged to have occurred on October 15, 2008, and

20   November 18, 2008, and (2) on the entire IIED claim.

21   I.  Debt Collection Practices Claims

22        Both the FDCPA and the OUDCPA claims are subject to a one-year

23   statute of limitations.  15 U.S.C. § 1692k(d); Or. Rev. Stat. §

24   (O.R.S.) 646.641(3).  Plaintiff filed this action on October 14,

25   2009.   Thus, to the extent the claims are based on conduct

26   occurring before October 14, 2008, the claims are time-barred.

27   See Mathis v. Omnium Worldwide, No. CV-04-1614-AA, 2006 WL 1582301,

28   at *1 (D. Or. June 4, 2006) (granting summary judgment to defendant

     5 - OPINION & ORDER

1  on FDCPA claim to the extent claim was based on communications

2  occurring more than one year before action was filed).

3      Plaintiff concedes this motion.  I note that while the parties

4  agree that only phone calls made by defendant to plaintiff on

5  October 15, 2008, and November 18, 2008, are actionable, defendant

6  indicates that there were two phone calls (one on October 18, 2008,

7  and a second one on November 18, 2008), and plaintiff indicates

8  that there were three phone calls (one on October 18, 2008, and two

9  on November 18, 2008).  This discrepancy is not an obstacle to

10 resolving the summary judgment motion.  Presumably, the evidence at

11 trial will establish how many phone calls occurred after October

12 14, 2008.

13     Additionally, while plaintiff concedes the motion, plaintiff

14 contends that the calls outside the statute of limitations period

15 are relevant in determining whether the calls within the

16 limitations period were part of an abusive or harassing pattern.

17 As I explained to the parties at oral argument, I defer resolution

18 of this issue to the pretrial conference, although, as I explained,

19 the evidence may well be admitted with a limiting instruction. See

20 Mathis, 2006 WL 1582301, at *1 (while limiting the debt collection

21 claims to communications occurring within one year of the filing

22 date of the action, court indicated that the time-barred

23 communications might still be relevant in determining whether the

24 actionable communications violated the FDCPA); see also Pittman v.

25 J.J. MacIntyre Co. of Nev., Inc., 969 F. Supp. 609, 612 (D. Nev.

26 1997) (court expressly held that "while the statute of limitations

27 renders those specific communications between the defendant and the

28 plaintiff prior to September 21, 1994 inactionable, evidence of

6 - OPINION & ORDER

1  these prior communications would certainly be relevant to

2  establishing whether the calls occurring within the limitations

3  period were part of an abusive or harassing pattern.").

4  II.  IIED

5      To sustain an IIED claim, plaintiff must show that defendant

6  intended to inflict severe emotional distress, that defendant's

7  acts were the cause of plaintiff's severe emotional distress, and

8  that defendant's acts constituted an extraordinary transgression of

9  the bounds of socially tolerable conduct.  McGanty v. Staudenraus,

10  321 Or. 532, 563, 901 P.2d 841, 849 (1995); see also Babick v.

11  Oregon Arena Corp., 333 Or. 401, 411, 40 P.3d 1059, 1063 (2002) (to

12  state an IIED claim under Oregon law, plaintiff must prove, inter

13  alia, that defendants' actions "constituted an extraordinary

14  transgression of the bounds of socially tolerable conduct.")

15  (internal quotation omitted).

16      Conduct that is merely "rude, boorish, tyrannical, churlish,

17  and mean" does not support an IIED claim.  Patton v. J.C. Penney

18  Co., 301 Or. 117, 124, 719 P.2d 854, 858 (1986).  "[T]he tort does

19  not provide recovery for the kind of temporary annoyance or injured

20  feelings that can result from friction and rudeness among people in

21  day-to-day life even when the intentional conduct causing

22  plaintiff's distress otherwise qualifies for liability."  Hall v.

23  The May Dep't Stores Co., 292 Or. 131, 135, 637 P.2d 126, 129

24  (1981); see also Watte v. Maeyens, 112 Or. App. 234, 237, 828 P.2d

25  479, 480-81 (1992) (no claim where employer threw a tantrum,

26  screamed and yelled at his employees, accused them of being liars

27  and saboteurs, then fired them all); Madani v. Kendall Ford, Inc.,

28  312 Or. 198, 205-06, 818 P.2d 930, 934 (1991) (no claim where

7 - OPINION & ORDER

1   employee terminated for refusing to pull down pants).

2       In a 2008 case, the Oregon Court of Appeals explained the

3   following parameters of the tort:

4           A trial court plays a gatekeeper role in evaluating
        the viability of an IIED claim by assessing the allegedly
5       tortious conduct to determine whether it goes beyond the
        farthest reaches of socially tolerable behavior and
6       creates a jury question on liability. . . .

7       * * *

8       The classification of conduct as "extreme and outrageous"
        depends on both the character and degree of the conduct.
9       As explained in the Restatement at § 46 comment d:

10          "Liability has been found only where the conduct
            has been so outrageous in character, and so extreme
11          in degree, as to go beyond all possible bounds of
            decency, and to be regarded as atrocious, and
12          utterly intolerable in a civilized community."

13          Whether conduct is an extraordinary transgression is
        a fact-specific inquiry, to be considered on a
14      case-by-case basis, based on the totality of the
        circumstances. We consider whether the offensiveness of
15      the conduct exceeds any reasonable limit of social
        toleration, which is a judgment of social standards
16      rather than of specific occurrences.

17  House v. Hicks, 218 Or. App. 348, 358-60, 179 P.3d 730, 737-39

18  (2008) (internal quotations and citations omitted), rev. denied,

19  345 Or. 381, 195 P.3d 911 (2008).

20      Defendant moves for summary judgment on this claim, arguing

21  that its conduct did not transgress the bounds of socially

22  tolerable conduct, and that plaintiff did not suffer emotional

23  distress severe enough to sustain an IIED action.

24      A.   Conduct

25      Defendant argues that the alleged conduct does not rise to the

26  level required to sustain an IIED claim.  There is no evidence in

27  the record showing that defendant used profanity or threatened

28  violence.  While defendant acknowledges that its employees made a

8 - OPINION & ORDER

1    number of persistent and aggressive calls in an effort to collect

2    an undisputed debt over a period of time, and according to

3    plaintiff, defendant threatened to file lawsuits and garnish

4    plaintiff's wages, and made statements that plaintiff found

5    condescending and abusive, defendant argues that the alleged

6    conduct was not so outrageous as to justify pursuing an IIED claim.

7    At most, defendant argues, it was "rude, boorish, tyrannical,

8    churlish, and mean," which is not enough to support the claim.

9         In Mathis, Judge Aiken granted summary judgment to the

10   defendant on the plaintiff's IIED claim even though she

11   acknowledged that "[a]busive debt collection telephone calls may

12   support a claim for IIED, see, e.g., Turman v. Central Billing

13   Bureau, Inc., 279 Or. 443, 447-48, 568 P.2d 1382 (1977)," and noted

14   that "the repeated nature of allegedly harassing behavior is

15   relevant to whether conduct is extreme or outrageous." Mathis,

16   2006 WL 1582301, at *7.

17        Judge Aiken explained that

18        . . . plaintiff does not present evidence that Estate
          Recoveries engaged in abusive, harassing, or other
19        "outrageous" conduct. Plaintiff presents no evidence
          that Estate Recoveries used profane language, issued
20        threats, or called incessantly at all hours of the day.
          Rather, Estate Recoveries called plaintiff six or eight
21        times over a period of fourteen months seeking collection
          of unpaid credit card debts, and plaintiff alleges that
22        one caller engaged in "pressure tactics" when attempting
          to settle Account 5852. . . . However, this conduct does
23        not suffice to support a claim for IIED. See Conboy v.
          AT & T Corp., 241 F.3d 242, 258-59 (2d Cir. 2001)
24        ("Plaintiffs were not physically threatened, verbally
          abused, or publicly humiliated in any manner.... They
25        were only harassed with numerous telephone calls from
          debt collectors. This conduct is not so outrageous as to
26        go beyond all possible bounds of decency or to be
          regarded as utterly intolerable in a civilized society.")
27        (quotation marks and citation omitted).

28   Id. (citation omitted).

9 - OPINION & ORDER

1        In the Turman case, cited by Judge Aiken, the plaintiff

2   initially received an anonymous phone call, informing her that

3   someone from the sheriff's office would be out to her house to

4   serve papers on her and that unless she paid her overdue bill in

5   full to "Central Billing," her husband would lose his job and she

6   could lose her house and everything she owned.  Turman, 279 Or. at

7   446, 568 P.2d at 1384.  The debt owed by the plaintiff was to a

8   ophthalmologist from whom the plaintiff received ongoing treatment

9   for a disability.  Plaintiff worked out a payment plan with the

10  doctor's clinic, despite the defendant having insisted that she not

11  contact the clinic, but deal with "Central Billing" instead.  Id.

12  at 447, 568 P.2d at 1384.

13       Despite the payment plan, the defendant continued to call the

14  plaintiff demanding payment.  Id. at 447, 568 P.2d at 1385.  The

15  caller became irate upon learning of the plaintiff's payment

16  arrangements, shouting at the plaintiff and threatening her.  Id.

17  Despite the plaintiff's explanations of why she had to maintain

18  good relations with the clinic, the defendant continued to demand

19  immediate payment and to threaten to take away the plaintiff's

20  husband's job and their home.  Id. at 448, 568 P.2d at 1385.  The

21  plaintiff was in tears.

22       After calling a friend to come over and keep her company

23  because she was so upset, the defendant's agent called again, while

24  the plaintiff's friend was present.  Id.  The friend testified that

25  the defendant used swear words and had "quite a vocabulary."  Id.

26  The caller continued to use profane and abusive language, including

27  calling plaintiff "scum" and a "dead beat," and told plaintiff she

28  could care less about plaintiff's being blind.  Id.

10 - OPINION & ORDER

1    The facts in the instant case fall somewhere between the

2   scenarios present in Mathis and Turman.  While I think this is a

3   close question, for the reasons explained below, I agree with

4   plaintiff that the facts at least create a jury question on the

5   issue of defendant's conduct.

6    First, because the IIED claim carries a two-year statute of

7   limitations, the calls to plaintiff's father and the September 2008

8   withdrawal of money from plaintiff's bank account, are properly

9   considered in assessing defendant's liability on this claim.

10   While, as in Mathis, there is no evidence of profane language or

11  calling at hours of the day, a reasonable factfinder could conclude

12  that defendant crossed the boundary into socially intolerable

13  conduct because of the calls to plaintiff's father, especially the

14  call after defendant was on notice that plaintiff did not live with

15  his father, that plaintiff's father was ill, and that calls to

16  plaintiff's father upset his father and exacerbated his symptoms,

17  and because of defendant's unauthorized September 2008 withdrawal

18  from plaintiff's bank account, despite plaintiff's request that

19  defendant hold off on that withdrawal because it would leave

20  plaintiff without money to pay for rent or food.

21    Second, as the House court recognized, the "character and

22  context of particular conduct frames its categorization as

23  outrageous or not."  House, 218 Or. App. at 360, 179 P.3d at 737.

24  As far as character is concerned, "the illegality of conduct is

25  relevant to, but not determinative of, whether the conduct is

26  sufficiently outrageous to support an IIED claim."  Id. at 359, 179

27  P.3d at 737.   I make no judgment at this stage as to whether

28  defendant's conduct actually violated the FDCPA or the OUDCPA, and

11 - OPINION & ORDER

1  I recognize that the pre-October 14, 2008 may not be considered in
2  the assessment of defendant's liability on the debt collection
3  practices claims.  But, the summary judgment record raises enough
4  concerns about the legality of defendant's conduct to support
5  denying defendant's motion on this issue.

6       As to the context of the conduct, a debtor-creditor
7  relationship, such as the one here, and as existed in Turman, is a
8  recognized "special relationship" that "imposes on the defendant a
9  greater obligation to refrain from subjecting the victim to abuse,
10 fright, or shock than would be true in arm's-length encounters
11 among strangers."  Id. at 360, 179 P.3d at 737 (internal quotation
12 omitted) (citing Turman for the proposition that the debtor-
13 creditor relationship is one type of special relationship).  The
14 fact that the debtor-creditor relationship is one such "special
15 relationships" is likely a recognition that "[t]he purpose of the
16 FDCPA is to protect vulnerable and unsophisticated debtors from
17 abuse, harassment, and deceptive collection practices."  Guerrero
18 v. RJM Acquisitions LLC, 499 F.3d 926, 938 (9th Cir. 2007); see
19 also Thomas v. U.S. Bank, N.A., No. CV 05-1725-MO, 2007 WL 764312,
20 at *9 (D. Or. Mar. 8, 2007) (describing the FDCPA as the "federal
21 corollary" to the OUDCPA).  The purpose of the statute and the
22 context of the relationship are relevant to the issue of the
23 outrageousness of defendant's conduct and here, that issue is
24 properly left to the jury's determination.

25      B.  Severity

26      Defendant separately attacks plaintiff's evidence as to the
27 severity of his distress, arguing that it is insufficient as a
28 matter of law to support the IIED claim.  Defendant acknowledges

12 - OPINION & ORDER

1  that the summary judgment record shows that defendant's calls

2  caused plaintiff to suffer anxiety attacks, shame, and

3  embarrassment.  But, defendant notes that plaintiff was already

4  suffering from anxiety attacks because of his financial troubles

5  and that the nurse practitioner who treated plaintiff could not

6  recall plaintiff citing distress caused by phone calls from

7  defendant as a basis for treatment.

8       Defendant relies on Bergin v. North Clackamas School Dist.,

9  No. CV-03-1412-ST, 2005 WL 66069, at *23-24 (D. Or. Jan. 12, 2005),

10 where Judge Stewart first set out the relevant law regarding the

11 requisite severity:

12      To be severe, distress must be more than mild and
        transitory. . . . Accordingly, the intensity and duration
13      of a plaintiff's emotional distress are primary factors
        to determine severity. . . . The distress must be more
14      than hurt feelings. . . . Instead, the distress must be
        so severe that no reasonable [person] could be expected
15      to endure it.

16 Id. (internal quotation and citations omitted)

17      Next, Judge Stewart noted that there was an issue of fact

18 regarding the source of the plaintiff's depression because the

19 plaintiff conceded that sources other than the defendant's conduct

20 contributed to her depression.  But, Judge Stewart held, even

21 assuming that the defendant in the case was primarily responsible

22 for her depression, the plaintiff had still failed to demonstrate

23 that her distress was so severe that no person could be expected to

24 endure it.  Id.  The plaintiff cried after a meeting and eventually

25 needed to ask for leave in order to deal with her depression.  Id.

26 This was not enough to demonstrate severe emotional distress.  Id.

27      Plaintiff contends that he experienced severe distress not

28 only because of the calls made directly to him, but also because of

13 - OPINION & ORDER

1   the distress caused by calls to his father which triggered his

2   father's disease symptoms and created fear for plaintiff that his

3   own personal problems may hasten his father's death.  Additionally,

4   plaintiff states that defendant's unauthorized withdrawal of funds

5   in September 2008 added to his distress.  Plaintiff contends that

6   he has at least created an issue of fact regarding the severity of

7   his distress.

8       I agree with plaintiff.  The jury could conclude that the

9   primary source of plaintiff's anxiety was plaintiff's financial

10  situation, unrelated to defendant's conduct.  Or, the jury could

11  conclude that the primary source of his anxiety was defendant's

12  conduct.  Additionally, the jury may determine that plaintiff was

13  perhaps more susceptible to distress than other debtors because his

14  financial situation was so dire, as seen by his testimony that the

15  September 2008 withdrawal left him without money for rent or food,

16  and because the calls to his father created an anxiety completely

17  different in kind.  See Or. Uniform Civ. Jury Ins. No. 70.06

18  ("previous infirm condition").  Finally, plaintiff does attest to

19  specific, severe physical symptoms he experienced as part of his

20  anxiety attacks, including being unable to breathe, shaking,

21  "quaking," being unable to sleep, nausea, and loss of appetite.

22  Pltf's Depo. at p. 20.  He felt like his body was "shutting down."

23  Id.  Admittedly, the severity issue, like the conduct issue, is a

24  close question.  But, the facts are sufficient to create an issue

25  for the jury.

26                              CONCLUSION

27      Defendant's motion for partial summary judgment [43] is

28  granted as to the debt collection practices claims before October

14 - OPINION & ORDER

1   14, 2008, and is denied as to the IIED claim.

2        IT IS SO ORDERED.

3                    Dated this   4th   day of November , 2010.

4

5                                        /s/ Dennis J. Hubel

6                                        _____

7                                        Dennis James Hubel
                                         United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15 - OPINION & ORDER